SYNOPSYS, INC., Plaintiff,

v.

RICOH COMPANY, LTD., Defendant.

No. C 03–2289MJJ.

United States District Court,
N.D. California.

Sept. 22, 2003.

Howrey Simon Arnold & White LLP, San Francisco, CA, Teresa M. Corbin, Howrey Simon Arnold & White, LLP, Menlo Park, CA, Matthew E. Hocker, Howrey Simon Arnold & White, Menlo Park, CA, Thomas C. Mavrakakis, Howrey Simon Arnold & White, Menlo Park, CA, for plaintiff.

Jonathan Weissglass, Altshuler Berzon Nussbaum Rubin & Demain, San Francisco, CA, Deanna Dahlyce Allen, Dicksten Shapiro Morin & Oshinsky LLP, Washington, DC, Eric Oliver, Dicksten Shapiro Morin & Oshinsky, LLP, Washington, DC, Michael A. Weinstein, Dickstein Shapiro Morin & Oshinsky LLP, Washington, DC, Gary M. Hoffman, Dickstein Shapiro Morin & Oshinsky LLP, Washington, DC, Jeffrey B. Demain, Altshuler, Berzon et al, San Francisco, CA, Kenneth W. Brothers, Dickstein Shapiro Morin & Oshinsky, LLP,Washington, DC, for Ricoh Co., Ltd.

## ORDER DENYING DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, STAY OR TRANSFER

JENKINS, District Judge.

### INTRODUCTION

Before the Court is Ricoh Company, Ltd.'s ("Defendant") motion to dismiss or, in the alternative, stay or transfer the above-entitled action. In order to resolve this motion, the Court must determine whether: (1) Defendant is subject to personal jurisdiction in this forum; (2) this action presents an actual case or controversy; and (3) the District of Delaware is a more ideal forum for this action. Having considered the briefing in this matter and listened to argument from the parties, the Court **DENIES** Defendant's motion in its entirety.

Erik Keith Moller, Howrey & Simon, Menlo Park, CA, Christopher L. Kelley,

## FACTUAL BACKGROUND

Plaintiff is incorporated in Delaware and maintains its headquarters in this district. Opposition to Motion to Dismiss or, in the Alternative, Stay or Transfer ("Opposition") at 23:9–11. It is the industry-leading provider of "logic synthesis software," which is used in the process of designing application specific integrated circuits ("ASICs"). ASICs are typically designed by the companies that intend to use them in consumer products or electrical devices, but are manufactured under contract by semiconductor foundries. These foundries require that the ASIC designs that they fabricate be designed using "foundry library cells" contained in a library provided by the particular foundry. These library cells are typically quite primitive in function and are not equipped to design circuits of any complexity. Id. 2:22–2:1.

Thus, instead of constructing their designs from foundry library cells, circuit designers describe their target circuits using a type of computer language called hardware descriptive language ("HDL"). A circuit designer uses HDL to describe how the desired electrical circuit can be composed from a collection of components, or cells, from the "design library." The cells in the design library have significantly greater functionality than foundry library cells, and correspond to larger, more significant circuit elements. Id. at 3:2–9.

When a circuit designer has completed an HDL description of the target ASIC, this HDL description can be provided as an input to logic synthesis software to derive an equivalent circuit construction from the particular set of "foundry library cells" provided by the foundry that the designer intends to use. The output of the logic synthesis software can then be supplied to the foundry for generation of the desired ASIC. Id. at 3:10–14.

Plaintiff's most widely used logic synthesis software product is called Design Compiler. Circuit designers using Design Compiler first construct an HDL description of the intended circuit utilizing cells drawn from Plaintiff's design library called DesignWare. Design Compiler then takes HDL that utilizes circuit cells found in DesignWare and produces circuits based upon cells from the foundry library used by the contract foundry. Id. at 3:15–19.

Defendant is a Japanese corporation headquartered in Tokyo. It manufactures digital office equipment, including copiers, printers, facsimile machines, personal computers, and digital cameras. Declaration of Erik Moller ("Moller Decl."), Exh. F (Ricoh 2003 Annual Report). Defendant's "global network" includes 395 wholly-owned subsidiaries (133 domestic; 262 foreign), several of which are located throughout the United States, including California. Id., Exh. E (Ricoh Fact Book) at 18. For example, Ricoh Corporation, Defendant's "the North and South American sales and marketing unit" is headquartered in New Jersey. Id., Exh. I. Ricoh Corporation is also registered to do business in California and maintains its Western Regional Sales Office in Tustin, California. See id., Exhs. J, L. In addition to Ricoh Corporation, Defendant maintains at least three other "principle overseas operations" in California.[1]

On January 21, 2003, Defendant sued six of Plaintiff's customers-designers and manufacturers of computer chips ("Dela-

---

1. Ricoh Silicon Valley, Inc., Cupertino (development and marketing); Ricoh Electronics, Inc., Tustin (office equipment and sales); Ricoh Innovations, Inc., Menlo Park (basic and applied research and development ("R & D") and venture capital financing). See Moller Decl., Exh. E at 20–21.

ware defendants") [2]-in the District of Delaware ("Delaware action"), alleging infringement of process claims described in its United States Patent No. 4,922,432 ("'432 patent").[3] Plaintiff immediately assumed control of the defense of its customers in the Delaware action pursuant to indemnification agreements. On June 5, 2003, Plaintiff filed an action in this court for a declaratory judgment of non-infringement with regard to the '432 patent and U.S. Patent No. 5,197,016 (the "'016 patent").[4] Then, on August 29, the Delaware action was transferred to this district.

The Court now considers Defendant's motion to dismiss or, in the alternative stay or transfer.

## ANALYSIS

### I. Motion to Dismiss

#### A. Personal Jurisdiction

■■■ "Federal Circuit law governs the issue of personal jurisdiction in patent-related cases." *Deprenyl Animal Health, Inc. v. University of Toronto Innovations Foundation*, 297 F.3d 1343, 1348 (Fed.Cir. 2002). However, in determining whether personal jurisdiction exists over an out-of-state defendant, the Federal Circuit applies the same two-prong analysis as all federal circuits: (1) whether the forum state's long-arm statute permits service of process; and (2) whether the exercise of jurisdiction comports with the requirement

of due process. However, because California's long-arm statute is coextensive with the limits of due process, the court need only consider the requirements of due process. *See Dainippon Screen Manufacturing Company, Ltd. v. CFMT, Inc.*, 142 F.3d 1266, 1269–70 (Fed.Cir.1998). In exercising jurisdiction over an out-of-state defendant, due process requires that said defendant "have certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

#### 1. Minimum Contacts

■■■ Under the minimum contacts test, jurisdiction may either be specific or general. Specific jurisdiction exists where the defendant "has purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that arise out of or relate to those activities." *Inamed Corp. v. Kuzmak*, 249 F.3d 1356, 1360 (Fed.Cir.2001). "General jurisdiction arises when a defendant maintains 'continuous and systematic' contacts with the forum state even when the cause of action has no relation to those contacts." *LSI Industries Inc. v. Hubbell Lighting, Inc.*, 232 F.3d 1369, 1375 (Fed.Cir.2000). Because Plaintiff does not allege an injury arising out of or related to Defendants

2. Aeroflex Incorporated ("Aeroflex"); AMI Semiconductor, Inc. ("AMI"); and Matrox Electronic Systems Ltd., Matrox Graphics Inc., Matrox International Corp., and Matrox Tech Inc. (collectively, "Matrox").

3. The '432 describes "a computer-aided design system and method for designing an [ASIC] which enables the user to define functional architecture independent specifications for the integrated circuits and which translates the functional architecture independent specifications into the detailed information

need for directly producing the integrated circuit." *Id.* at Abstract.

4. In the '016 patent describes "[a] computer-aided system and method...for designing an [ASIC] whose intended function is implementation both by a hardware subsystem including hardware elements on the integrated circuit and by a software subsystem including a general purpose microprocessor also on the integrated circuit." *Id.* at Abstract. The '016 patent is not at issue in the Delaware action.

activities in this forum, the Court's analysis is limited to one of general jurisdiction.

■ There is no dispute that Defendant, a Japanese Company headquartered in Tokyo, does not have any direct contact with California. However, this fact is not dispositive. In *LSI Industries*, an out-of-state defendant "employ[ed] multiple distributors in ... and net[ted] several millions of dollars per year from sales in [the forum]," but never sold any of its allegedly infringing products the state. *Id.* at 1370. Based on these facts, the court held that defendant "maintain[ed] 'continuous and systematic' contacts with [the forum]" and was "subject to general jurisdiction ... under the Due Process Clause." *Id.* at 1375.

In this case, Defendant has a "global network" of 262 wholly-owned subsidiaries outside of Japan, which consist of sales, manufacturing, and R & D operations. *See* Moller Decl., Exh. E at 18–23. For example, one of Defendant's "principle oversees operations," Ricoh Corporation (*see id.* at 20), is described its "North and South American sales and marketing unit...." *See id.*, Exh. I. Although headquartered in New Jersey (*id.*), Ricoh Corporation is registered to do business in California (*see id.*, Exh. L) and maintains a regional sales office in Tustin. *See id.*, Exh. J. In addition to Ricoh Corporation, Defendant has three other "principle" subsidiaries which are based in California. *Id.*, Exh. E at 18–23. Although the amount of sales in California is unknown, Defendant states that its sales in North and South America equal $2.9 billion. *Id.* Exh. F at 18. Thus, like *LSI*, the Defendant here maintains a significant business presence in the forum (sales, manufacturing, and R & D). Moreover, given the size of California's economy, it is reasonable to assume that Defendant generates substantial sales in this forum as well. Thus, under Federal Circuit precedent, the exercise of personal jurisdiction is proper under these circumstances.

*LSI* is also consistent with Ninth Circuit precedent with respect to the doctrine of "general agency." In *Chan v. Society Expeditions, Inc.* 39 F.3d 1398, 1405 (9th Cir.1994), the court held that "[a] foreign corporation is doing business in [the forum] ... when its ... representative [in the forum] provides services beyond 'mere solicitation' and these services are sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services." *Id.* (citation and quotation omitted). In other words, under Ninth Circuit precedent, the question is whether the subsidiary's presence truly substitutes for that of the parent. *See Doe v. Unocal,* 248 F.3d 915, 928–29 (9th Cir. 2001). However, day-to-day control is not required. *See Modesto City Schools v. Riso Kagaku Corporation,* 157 F.Supp.2d 1128, 1133 (E.D.Cal.2001) ("day-to-day control is not an element of the general agency test in the Ninth Circuit"). In this case, it is evident that Defendant's multi-faceted operations are necessary to its viability in the forum and represent tasks Defendant would have to perform itself but for the existence of its subsidiaries based in this forum or registered to do business here.

## 2. Reasonableness

■■ In addition to minimum contacts, the exercise of personal jurisdiction must be reasonable. "The test of unreasonableness is a multi-factored balancing test that weighs any burdens on the defendant against various countervailing considerations, including the plaintiff's interest in a convenient forum and the forum state's interest in resolving controversies flowing from in-state events." *Viam Corporation*

*v. Iowa Export–Import Trading Co.*, 84 F.3d 424, 429 (Fed.Cir.1996) (citation omitted). Specifically, courts are to consider (1) the burden on the defendant; (2) the interests of the forum state; (3) the plaintiff's interest in obtaining relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the interest of the states in furthering their social policies. *Id.* However, a finding of unreasonableness is generally limited to "the rare situation in which the plaintiff's interest and the state's interest in adjudicating the dispute in the forum are so attenuated that they are clearly outweighed by the burden of subjecting the defendant to litigation within the forum." *Beverly Hills Fan Company. v. Royal Sovereign Corporation*, 21 F.3d 1558, 1568 (Fed.Cir.1994). Upon consideration of these factors, the Court finds that the excise of jurisdiction is reasonable under these circumstances.

Therefore, the Court **DENIES** Defendant's motion to dismiss for lack of personal jurisdiction.

### B. Case or Controversy

█ In order for a federal court to exercise jurisdiction, there must be an actual case or controversy. For a court to proceed in the absence of such would run afoul of the constitutional prohibition against advisory opinions. *See Aetna Life Insurance Co. v. Haworth*, 300 U.S. 227, 239–40, 57 S.Ct. 461, 81 L.Ed. 617 (1937). In determining whether an actual case or controversy exist in the context of a patent declaratory judgment action, the Federal Circuit employs an objective test, which looks at the conduct of both plaintiff and defendant:

First, the defendant's conduct must have created on the part of the plaintiff a *reasonable apprehension* that the defendant will initiate suit if the plaintiff continues the allegedly infringing activity. Second, the plaintiff must actually have either produced the device or have prepared to produce that device.

*Arrowhead Industrial Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 736 (Fed.Cir. 1988) (quoting *Goodyear Tire & Rubber Company v. Releasomers, Inc.*, 824 F.2d 953, 955 (Fed.Cir.1987)) (emphasis added).

However, the Federal Circuit has stated that this test must "read, applied, and perhaps modified in light of the facts of [the particular case]" *Id.* Thus, in *Arrowhead*, the court distilled the test down to two "core elements": "(1) acts of defendant indicating an intent to enforce its patent; and (2) acts of plaintiff that might subject it or its customers to suit for patent infringement." *Id.* at 737.

### 1. Defendant's Conduct (Reasonable Apprehension)

█ In this case, Defendant has unconditionally agreed not to sue Plaintiff for infringement as to any claims in the '432 and '016 patents based upon the products currently produced by Plaintiff. *See* Takiguchi Decl. ¶ 10. Defendant argues that this fact alone is sufficient to negate any reasonable apprehension of suit. *See Super Sack Manufacturing Corporation v. Chase Packaging Corporation*, 57 F.3d 1054, 1059 (Fed.Cir.1995) (Plaintiff's promise not to sue for patent infringement based on products made, sold, or used prior to the date of its motion to dismiss "removes from the field any controversy sufficiently actual to confer jurisdiction"); *Intellectual Property Development, Inc. v. TCI Cablevision of California, Inc.*, 248 F.3d 1333, 1342 (Fed.Cir.2001) ("the statement of non-liability divest[s] the district court of Article III jurisdiction..."). However, neither *Super Sack* nor *Intellectual Property* is directly on point. Each involves a situation in which the plaintiff, the patent holder, brought suit for in-

fringement, which was followed by a counter-claim for non-infringement by defendant. At some point during the litigation, plaintiff dropped its claim for infringement and covenanted not to sue defendant based on the allegedly infringing products. Neither case involved customer suits.

Moreover, the *Arrowhead*, court endorsed an earlier Seventh Circuit decision which "employed a test requiring an apprehension that plaintiff or its *'customers* face an infringement suit or *threat* of one'" *Id.* at 736 (quoting *Grafon Corp. v. Hausermann*, 602 F.2d 781, 783 (7th Cir. 1979)). In this case, Defendant has initiated a suit against several of Plaintiff's customers in the District of Delaware. Thus, there can be no doubt regarding Defendant's intent to enforce its patents against such customers. Thus, based on *Arrowhead*, the Court finds that the "reasonable apprehension" requirement has been satisfied.

### 2. Plaintiff's Conduct

The Court now turns to the second prong of the case or controversy test prescribed by the Federal Circuit: "acts by Plaintiff that might subject it or its customers to suit for patent infringement." *Arrowhead*, 846 F.2d at 737. Put another way, "[p]laintiff must be engaged in an actual making, selling, or using activity subject to an infringement charge or must have made meaningful preparation for such activity." *Id.* at 736. Thus, the question whether Defendant's action against the Delaware defendants sufficiently implicates Plaintiff's manufacture of the Design Compiler such that there is a justiciable controversy.

Several Court's have addressed this issue. In the seminal case of *Aralac v. Hat Corporation of America*, 166 F.2d 286 (1948), plaintiff manufactured and sold "casein fiber" to hat manufacturers and others. Defendant threatened to and, in one case, actually did file suit for infringement against several of plaintiff's customers stating that the use of casein fibers in their manufacturing process infringed its patent. However, the Court found that there was no controversy because "[t]he invention covered by the patents [was] not per se for casein fiber but cover[ed] the process of combining such fibers with fur fibers to form hats or hat materials." *Id.* at 293. The Court reasoned:

> Plaintiff has the right to have that which it lawfully produces freely bought and sold without restraint or interference. It is a right which attaches to its product, to a particular thing—as an article of commerce—and it continues only so long as the commodity to which the right applies retains its separate identity. If in the course of trade that commodity is combined with other things in the process of the manufacture of a new commodity, the trade right in original part as an article of commerce is necessarily gone.... The situation as to plaintiff is no different than if plaintiff sold milk, from which casein is made, to its customers and they in turn made their own casein fibers which they might thereafter use in a way to infringe defendant's patents, or in a way which would not.

*Id.* at 293–94, 297.

Several lower courts have distinguished *Aralac* based on the fact that the product at issue, unlike casein fiber, was essentially limited to the allegedly infringing use. *See, e.g., EIC Laboratories, Inc. v. Deuteruim Corporation.*, 1982 WL 52135 (S.D.N.Y.1982), 1982 U.S. Dist. LEXIS 17604, *5 (finding a controversy where it was likely that the product had a "limited number of uses, perhaps only that of which defendant complains"); *Wallace & Tiernan Inc. v. General Electric Company*, 291 F.Supp. 217, 223 (1968) (finding a controversy where the product "was developed chiefly, if not exclusively, for the use plain-

tiff seeks to defend and vindicate"). Thus, the question is whether Plaintiff's Design Compiler is (1) simply a commodity that is combined with other things to a form a new commodity; or (2) essentially limited to the allegedly infringing use by Plaintiff's customers.

Of course, Defendant contends that the former is true. Specifically, Defendant argues that the Delaware action its not premised on an allegation that "[Plaintiff's] software (without any actual chip manufacturing operation) infringes the '432 Patent." Motion at 9:8–11. Rather, Defendant theory is that "[b]y loading the [Plaintiff's] software onto [their] computers and designing ASIC chips using a process that combines software, hardware and certain manufacturing processes in a manner that infringes the '432 Patent ..., the Delaware defendants are actually infringing the process claimed in the '432 Patent." Reply 4:15–20. Plaintiff does not dispute this point. In fact, it admits that the ASICs are "typically designed by the companies that intend to use them [and] are manufactured under contract by semiconductor foundry businesses." Opposition at 2:23–25.

However, these facts fail to address the issue raised by *Aralac* and its progeny. Based on Plaintiff's description of the function of the Design Compiler, it is clear its primary use is to facilitate the very process that forms the basis of the suit against the Delaware defendants. In more technical terms, when a circuit designer has completed an HDL description of the target ASIC, this HDL description can be provided as an input to *logic synthesis software* to derive an equivalent circuit construction from the particular set of "foundry library cells" provided by the foundry that the designer intends to use. The output of the *logic synthesis software* can then be supplied to the foundry for generation of the desired ASIC. *Id.* at 3:10–14.

For these reasons, the Court finds that Defendant's claims against Plaintiff's customers are necessarily allegations against the primary use of the Design Compiler itself. Therefore, Plaintiff's actions in manufacturing and selling the product is sufficient to satisfy the case or controversy requirement.[5]

Therefore, the Court **DENIES** Defendant's motion to dismiss for lack of an actual case or controversy.

## II. Motion Stay or Transfer

Defendant's motion to stay the action or transfer it to the District of Delaware was based primarily on the fact that there was an earlier-filed action pending in that jurisdiction. Now that the Delaware action has been transferred to this forum, there is no basis to stay or transfer the action.[6]

## CONCLUSION

Therefore, the Court **DENIES** Plaintiff's motion to dismiss or, in the alternative, stay or transfer.

**IT IS SO ORDERED.**

---

5. Plaintiff's duty to indemnify its customer is also sufficient to establish a case or controversy *See Minebea Co., Ltd. v. Papst*, 13 F.Supp.2d 35, 39 (D.D.C.1998) (citing multiple cases for the proposition that a duty to indemnify is sufficient to create a justiciable controversy).

6. For the same reason, it would also be inappropriate for the Court to apply the first-to-file rule *Pacesetter Systems, Inc. v. Medtronic, Inc.*, 678 F.2d 93, 94–95 (9th Cir.1982) ("this 'first to file' rule is not a rigid or inflexible rule to be mechanically applied, but rather is to be applied with a view to the dictates of sound judicial administration") *Id.*